[772 NYS2d 275]

In the Matter of JONATHAN A. WEINSTEIN (Admitted as JONATHAN ALAN WEINSTEIN), an Attorney, Respondent. DEPARTMENTAL DISCIPLINARY COMMITTEE FOR THE FIRST JUDICIAL DEPARTMENT, Petitioner.

First Department, February 19, 2004

**APPEARANCES OF COUNSEL**

*Thomas J. Cahill (Jeremy S. Garber* of counsel), for petitioner.

*Benjamin Brotman & Maltz, LLP (Susan Brotman* of counsel), for respondent.

## OPINION OF THE COURT

Per Curiam.

Respondent Jonathan A. Weinstein was admitted to the practice of law in the State of New York by the Second Judicial Department on June 21, 1967, as Jonathan Alan Weinstein and, at all times relevant to this proceeding, he has maintained an office for the practice of law within the jurisdiction of the Second Department, which transferred each of the three complaints involved in this proceeding to this Court.

On October 12, 2001, the Disciplinary Committee served respondent with a notice and statement of charges containing 32 counts of professional misconduct relating to three client matters—the Labutis matter, the Mercedes Murphy matter and the matter of Margaret Liu and Nancy Huang—alleging that he converted and failed to return client funds, drafted and filed false or recklessly inaccurate petitions and affidavits, engaged in improper solicitations, contacted a represented party without consent, made intentionally false or misleading written and oral statements to the Committee, and drafted a will appointing himself sole executor in charge of a charitable trust which he controlled at his discretion with no named beneficiaries. Respondent's answer denied all charges and raised certain affirmative defenses.

Referee John R. Horan, Esq., conducted a hearing over nine days in March 2002. On April 18, 2002, the Referee sustained 29 of the charges. After receiving evidence in mitigation and aggravation, the Referee, in a report dated December 11, 2002, reaffirmed his decision sustaining the charges and recommended disbarment, rejecting respondent's claim that while his conduct was due to carelessness and arrogance, his actions were not intentional. A Hearing Panel, after taking oral argument and receiving written submissions, recommended sustaining 12 of the charges and imposing a one-year suspension.

The Disciplinary Committee now moves pursuant to 22 NYCRR 603.4 (d) and 605.15 (e) (2) to disaffirm the Hearing Panel's determination to dismiss certain charges and its recommended sanction and to affirm the Referee's report and recommendation in its entirety.

In February 1996, counsel to the Kings County Public Administrator filed an affirmation stating that Charles Labutis,

who had died intestate in April of the previous year, was survived by his brother, Stanley, whose "present" whereabouts were "unknown." Genealogical Research Corporation (GRC), an heir-finding firm that offers its services for a percentage of the inheritance without disclosing to the heir the value or nature of the inheritance, commenced an investigation and located Stanley Labutis in a Staten Island nursing home. A GRC employee, Sandra Anderson, wrote to advise Labutis that GRC was looking for a Stanley Labutis regarding an estate matter, and, after receiving a letter from Labutis in reply, forwarded him a contract, pursuant to which he would retain GRC's services to ensure that his kinship was proven in court and, if proven, would pay GRC a 25% fee. GRC's owner, Dennis Langel, determined the fee based on his knowledge that the inheritance was over $100,000, that Stanley was likely the only eligible heir and that proving kinship would not be difficult. Labutis signed the agreement on or about May 17, 1996. Thereafter, Anderson wrote to advise Labutis of the death of his brother, Charles, and sent him a retainer agreement in the name of respondent, recommending that he retain respondent to represent him in the kinship proceedings and providing that respondent's fee would be paid by GRC. Labutis did not send back a signed retainer.

A nursing home psychologist, Dr. Martin Falk, testified that Labutis had indicated confusion to him over some documents he had been asked to sign. The psychologist expressed his view that Labutis had limited comprehension and was highly susceptible to the suggestions of others and that he therefore recommended that Stanley talk with Andrea Morse, Esq. of Staten Island. Morse met with Labutis, obtained a copy of the GRC agreement and, with the understanding that he had asked her to represent him, wrote to GRC, informing Langel that Labutis did not understand the agreement and disavowed it in its entirety. In addition, she wrote to inform counsel for the Public Administrator of Kings County that she was representing Labutis. Shortly thereafter, respondent telephoned Morse to discuss the GRC agreement, but the conversation "deteriorated" to the point that respondent called Morse an "idiot."

On August 30, 1996, Morse filed a notice of appearance in the kinship proceeding, and respondent thereafter wrote to counsel for the Public Administrator implicitly accusing Morse of an improper referral tie to the nursing home. Without notifying the Morse firm, and although he neither represented nor had

appeared for any party to the kinship proceeding, respondent arranged for an adjournment of the first hearing, scheduled in Kings County Surrogate's Court for October 21, 1996, resulting in Morse's father, with whom she was associated, making an unnecessary trip from Staten Island. When Morse appeared at the first kinship hearing on January 22, 1997, she was met by respondent, who announced "very loudly to everyone, this is the case I'm taking to the grievance committee." Morse, who during November and December of 1996, had begun to question whether Labutis knew what was occurring, appeared for him at the hearing, and respondent appeared for GRC to defend its claim for 25% of the assets recovered. During an off-the-record discussion with the Referee, Eric Prus, as to whether Labutis was competent, the Referee suggested that a guardianship proceeding be commenced. The kinship proceeding was then adjourned until May 21, 1997, so that such a proceeding could be commenced in the Supreme Court.

After Morse began drafting the papers, respondent prepared a petition brought on by order to show cause seeking to enjoin Morse, pending a hearing, from representing or acting in any way for Labutis in the kinship proceeding in Surrogate Court and requesting the appointment of counsel for Labutis in the guardianship proceeding. The petition, drafted by respondent and signed by Langel, stated that GRC located Labutis, who was previously "unknown," after an "intensive investigation" and that Langel had "visited him" before he signed the agreement. As noted, however, only Labutis's whereabouts were unknown; he was named as Charles's brother in the affirmation filed on behalf of the Public Administrator.

Charge 1 against respondent alleged that, in drafting the guardianship petition, he recklessly disregarded the truth in violation of Code of Professional Responsibility DR 1-102 (a) (5) (22 NYCRR 1200.3 [engaging in conduct prejudicial to the administration of justice]) by asserting, contrary to fact, that Labutis was "unknown" to the Surrogate's Court and Public Administrator prior to being contacted by GRC and that Langel met with Labutis personally in April or May of 1996. The Referee sustained the charge. While he conceded that the word "unknown" is a term of art in the Surrogate's Court, he found that respondent was using "artful phrasing" in an effort to convince the court that "GRC's services were clearly needed and indispensable to the court in determining kinship." The Referee credited Langel's testimony that, contrary to the

contents of the petition, he had never visited or talked to Labutis before the latter signed the GRC agreement and that he had never told respondent that he had "visited" Labutis before he signed the agreement. Finding respondent's explanation for the petition's contents "evasive . . . and not credible," the Referee noted that the petition commenced a proceeding to see if a guardian for Labutis should be appointed and concluded that respondent's statements "were clearly designed to avoid the appointment of a guardian."

With regard to respondent's testimony as to this petition, the Referee also stated that "[h]e brushes off with cavalier indifference, the entire statement in the petition that Langel had visited Stanley Labutis, explained to him the 'nature of his distributive share' and that 'he fully understood all of the details explained to him' and 'thereafter, signed an agreement with Langel,' by testifying that these assertions were based on '. . . information conveyed either by Dennis Langel or Sandy Anderson. I would have no information to the contrary. . . . It was germane to absolutely nothing, just an introductory sentence." The Referee found that respondent's testimony that whether or not Langel met with Labutis was "totally unimportant" was arguably true, "but in context, the petition portrays Labutis as competent because he signed the GRC agreement *after* Langel explained it to him" and that was "completely disingenuous" on respondent's part (emphasis in original). The Referee also found the petition "a revealing document as to respondent's tactics and his overall approach" since he attacked the Morses' representation of Labutis and charged them with unethical conduct, tortious interference with the GRC contract and improper use of the nursing home to obtain Labutis as a client.

The Hearing Panel recommended dismissal of Charge 1, agreeing with the Referee that whether Langel met with Labutis was germane to the guardianship proceeding, but finding that respondent was entitled to rely on his conversations with Langel and Anderson in drafting the petition and that there was insufficient evidence to support the charge that he recklessly disregarded the truth. What the Panel ignored was Langel's unimpeached testimony that he never told respondent that he had ever met or even spoken to Labutis.

The Referee's determinations crediting Langel's testimony and finding respondent's testimony "evasive, and not credible" should be accorded due deference. In any event, respondent had an obligation to ensure the accuracy of the relevant details of

the petition he drafted. Moreover, the serious allegations against the Morses are unsupported. Accordingly, Charge 1 should be sustained.

Charge 2 alleged that respondent violated DR 7-106 (c) (5) (22 NYCRR 1200.37 [failure to comply with local custom without giving notice to opposing counsel]) by adjourning a proceeding without notifying Ms. Morse. After the guardianship proceeding, held in Supreme Court, Kings County (Justice Scholnick), on April 1, 1997, terminated in a ruling that Labutis did not require a guardian, respondent faxed a letter advising the attorneys in the kinship proceeding that he had rescheduled the date of the next hearing from May 21, 1997 to May 6, 1997. He did not, however, notify Morse of the change and proceeded with the hearing on May 6, 1997 in her absence. In sustaining the charge, the Referee stated that "[w]henever [respondent] could ignore the fact that Morse and Morse had filed a notice of appearance on behalf of Stanley Labutis in the kinship proceeding, he would do so." He noted that advancing the date from May 21 to May 6 was not the first discourtesy to the Morses; on October 21, 1996, Mr. Morse had appeared, only to be told that respondent had adjourned the proceedings, and on January 22, 1997, when Ms. Morse appeared at 10:00 A.M., she was told that respondent had adjourned the hearing until noon.

The Hearing Panel dismissed Charge 2, noting that Justice Scholnick had testified before the Referee that Labutis indicated that he wanted respondent to represent him, even though no such statement was recorded in the transcript. The court appointed examiner confirmed the off-the-record colloquy. The Panel concluded that "[u]nder these circumstances, it was not improper for [r]espondent to fail to inform Morse or carry on in the proceeding without her, as she was not involved in the case, much less [r]espondent's adversary."

Charge 2 should be sustained. Although there is testimony that Labutis indicated that he wanted respondent to be his attorney, both Morse and Labutis's court appointed attorney testified that they did not recall a discussion either on or off the record, and it is not clear whether Labutis considered that Morse was simultaneously his attorney. Moreover, only Morse had put in a notice of appearance and Labutis did not sign a retainer agreement with respondent until May 7, 1997, more than one month after the April 1 hearing.

Charge 3, alleging a violation of DR 7-110 (b) (3) (22 NYCRR 1200.41 [communicating as to the merits of a cause with an of-

ficial before whom the proceeding is pending without notice to opposing counsel]), was based on allegations that at the May 6, 1997 kinship hearing, respondent, without notice to Morse, told Referee Prus that he was Labutis's attorney and that Morse, whom he referred to as "some attorney in Staten Island," had stated at the previous hearing that she purported to represent Labutis "even though we already did." This was untrue, since at the time of the previous hearing, which took place on January 22, 1997, Morse represented Labutis. Respondent went on to report to Prus about the April 1st guardianship proceeding. The Referee found that respondent "flagrantly" violated this rule by his statements to Prus concerning the substance of the proceeding. The Hearing Panel recommended dismissal of this charge for the same reasons it recommended dismissing Charge 2.

Charge 3 should be sustained since Morse was still involved in the case on May 6th (Labutis signed the agreement retaining respondent on May 7th) and respondent, at the very least, should not have made these statements to Prus without notice to her.

We agree with both the Referee's and the Panel's recommendations, which neither the Committee nor respondent challenges, to dismiss Charges 4 and 5 for lack of evidence.

Charge 6, alleging a violation of DR 1-102 (a) (8) (now [7] [engaging in conduct adversely reflecting on a lawyer's fitness as a lawyer]), was based on respondent's drafting of a will for Labutis on May 21, 1997, naming respondent as executor and bequeathing Labutis's entire estate to a charitable trust under respondent's exclusive control as sole trustee. We agree with the Panel that the evidence to support this charge was insufficient and it should be dismissed since the guardianship proceeding terminated with a finding that Labutis was competent and the will was ultimately admitted to probate.

Charges 7 to 10 alleged violations of DR 9-102 (a) and (b) (22 NYCRR 1200.46 [misappropriation of client funds and failure to preserve client funds]) and DR 1-102 (a) (4) and (8) (now [7]). These charges arose out of respondent's double billing of Labutis for disbursements in the kinship and guardianship proceedings. In the guardianship matter, the court approved $200 in fees and $725 in disbursements, a total of $925, to respondent, to be paid, along with other attorneys fees in that proceeding, "out of any assets which may come into the hands of Stanley Labutis." When respondent came into possession of Labutis'

distributive share from Charles's estate, $150,621.37, he paid himself out of Labutis's escrowed funds. Apparently, on the same day, respondent wrote another check to himself from Labutis's funds for $1,432.64, $945.62 of which was for disbursements in the guardianship proceeding and $487.02 of which was for disbursements in the kinship matter. Not only had the amount attributed to the guardianship proceeding already been paid, it was $225 more than the court had approved. The $487.02 attributed to the kinship proceeding was also improper; under the terms of the agreement between GRC and Labutis, GRC was to pay all disbursements out of the fee Labutis was charged. Respondent wrote to Labutis on August 26, 1997, informing him that he had received a gross distribution of $150,621.37 from the Public Administrator and that "we have deducted the sum of $4,857.64 representing the fees and disbursements ordered by the Court and additional disbursements required by reason of the allegations and conduct by the Morse[s]."

Charges 7 to 10 should be sustained. We agree with both the Referee and the Panel that respondent's double billing, failure to preserve client funds and intentional conversion of client funds (Charges 7 to 9) constituted violations of DR 9-102 (a) and (b), DR 1-102 (a) (4) and (8) (now [7]) and that the letter to Labutis informing him that the sum deducted from his distribution was "required" when it, in fact, constituted improper billing (Charge 10) was a violation of DR 1-102 (a) (4) (conduct involving dishonesty, fraud, deceit, or misrepresentation).

Charges 11 to 14 relate to two letters respondent wrote the Committee in connection with its investigation into the Morse complaint. Respondent stated in a letter dated June 23, 1997, "We met with Mr. Labutis and entered upon our representation of his interests in the Surrogate's Court proceeding," referring to the January 22, 1997 hearing before Referee Prus. Respondent did not, however, meet Labutis until April 1, 1997 and was retained sometime thereafter. He also represented in that letter that he only asked for a "token" fee for the guardianship proceeding when he actually requested that he be paid for 15 hours at $275 per hour. Charges 11 and 12 alleged that in making false and misleading statements to the Committee respondent engaged in conduct involving dishonesty, fraud, deceit or misrepresentation (DR 1-102 [a] [4]) and conduct that is prejudicial to the administration of justice (DR 1-102 [a] [5]).

Charges 13 and 14 were based on another letter to the Committee, dated November 20, 1998, in which respondent stated

that he had "appeared for [Labutis in the kinship matter] on January 22, 1997," although on that occasion he had appeared only on behalf of GRC. These charges also allege violations of DR 1-102 (a) (4) and (5) in that respondent made a misleading statement to the Committee.

The Referee sustained these charges, but the Panel recommended that they be dismissed. With respect to the statements regarding respondent's representation of Labutis at the January 22 hearing, the Panel reasoned that respondent admitted this error in his depositions and before the Referee. The charges based on these statements should be sustained. From the very beginning, in and around January 22, 1997, respondent asserted to Referee Prus and others that he, not the Morses, represented Labutis, and such misleading statements were relevant and prejudicial to the Committee's investigation. As to respondent's statement that he only asked for a "token" fee, while he asked for his standard fee in his sworn fee application, the testimony of Justice Scholnick, who presided at the guardianship proceeding, that he had a subsequent informal conversation with respondent in which the latter indicated that the application was a formality and that he, respondent, only expected a minimal fee for the guardianship proceeding supported respondent's position. Accordingly, to the extent Charges 11 and 12 rely on this statement, they should be dismissed.

Charges 15 to 25 involved the matter of Mercedes Murphy, who died intestate in Brooklyn, New York, on October 26, 1995. Lucille Alexander, Murphy's cousin, was contacted by GRC and agreed to pay a fee of 15% of her net distributive share. She subsequently signed a retainer with respondent providing that he would be paid out of GRC'S fee. In or around March 1997, another of Murphy's cousins, Daniel Dalton, who resided in Florida, was contacted by Blake & Blake, another heir locator firm, and thereafter retained Guy Parisi, Esq., a Westchester County attorney, to represent his interests for a 5% fee. On January 13, 1998, Parisi filed a notice of appearance.

On or about May 26, 1998, one day before the first scheduled hearing in the Murphy matter, GRC sent respondent a Murphy family tree with phone numbers. Seeking respondent's retention with respect to Murphy's estate, either respondent or someone speaking for him from his office called other Murphy heirs. The attorney-in-fact for one cousin retained respondent for 20% of the cousin's net distributive share. The son of another cousin also agreed on his mother's behalf to retain respondent for a

20% fee, but subsequently informed respondent that he did not have power of attorney for his mother, who suffered from Alzheimer's disease. Lillian Dalton, Daniel Dalton's wife, was also contacted that day and testified that a man who identified himself as respondent said he was the attorney for Lucille Alexander and asked Dalton to drop Parisi and retain him instead.

Over six months later, on February 19, 1999, respondent served a petition on Daniel Dalton directly, alleging that because Dalton and his attorney did not attend or participate in the proceedings relating to the Murphy estate (which was not true), he deserved to be awarded a fee of 25% from Dalton's net distributive share for his work on behalf of the other distributees. The petition further claimed that "all of the other distributees" had agreed to pay respondent a 25% fee.

Charge 15 alleged that by placing a call to the Dalton home and urging Lillian Dalton to have her husband retain him, respondent violated DR 2-103 (a) (22 NYCRR 1200.8 [soliciting professional employment from a prospective client]). We agree with the Referee that this call violated DR 2-103 (a) and accordingly sustain Charge 15. The Panel's recommended dismissal of this charge was incorrect, since it rested on whether respondent or his office knew that Parisi represented Dalton; the rule prohibits any form of in-person or telephone solicitation.

Charge 16 alleged that by contacting the Daltons by telephone and by serving Dalton with the petition directly, knowing that he was represented by Parisi, respondent violated DR 7-104 (a) (1) (22 NYCRR 1200.35 [communicating on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter]). Initially, we note that respondent may not have known of Parisi's representation when he placed the call to the Dalton residence (although he should have since the notice of appearance was filed four months earlier). Moreover, with respect to service of the petition directly on Dalton, respondent testified that he viewed the proceeding seeking recovery from Dalton as a new proceeding and that the court directed him to serve the petition directly on Dalton. Accordingly, giving respondent the benefit of the doubt, we conclude that Charge 16 should be dismissed.

Charges 22 to 25 alleged that respondent's oral (Charges 24 and 25) and written (Charges 22 and 23) denials to the Committee that neither he nor anyone in his office ever spoke directly by telephone to Lillian Dalton violated DR 1-102 (a) (4) (engaging in conduct involving dishonesty, fraud, deceit or misrepre-

sentation) and (5) (engaging in conduct that is prejudicial to the administration of justice). We agree with the Referee that "these statements were false and known to be false by respondent," and "made with the intention of misleading and frustrating staff counsel" and accordingly sustain these charges.

We agree with both the Referee and the Panel that Charges 17 to 20, which concern respondent's false representations in the Surrogate's Court petition and in a July 6, 1999 affidavit in support of a subsequent fee application that the distributees other than Dalton were paying him a 25% fee and the additional statement in the latter that the court in the Labutis matter awarded respondent a 33% fee, should be sustained. The Referee found respondent's assertion that these statements "were made not knowing they were false, simply incredible. . . . [It is] highly unlikely that respondent could have forgotten or misremembered such an important detail as his fees in the Dalton and Labutis matters. His fees are, apparently[,] what he is principally concerned about." It is noted that while, subsequent to the filing of the fee application, respondent's son, after receiving a call from Lucille Alexander, filed a supplemental affidavit to correct the "typographical errors" in the July 6 affidavit with respect to Alexander's fee arrangement, he did not correct the figures with respect to the other Murphy distributees and the Labutis matter.

On March 26, 1999, Margaret Liu and Nancy Huang contacted respondent concerning a dispute they were having with their brother, who had taken their parents to live with him and had thereafter cut off communication with the sisters. At the time respondent was retained, there was no court rule requiring a written retainer and no such retainer was memorialized in writing. Respondent testified that he told the sisters he would charge them $7,500 to represent their interests, with the balance to be determined and allowed by the court at the conclusion of the guardianship proceeding. The sisters testified that respondent promised to reimburse their advance retainer of $7,500 when the court authorized payment from their parents' estates. After the guardianship hearing, respondent submitted two affidavits, one for each parent, in support of attorneys' fees in the sum of $9,625 and disbursements, but failed to inform the court that the sisters had already paid him $7,500. On June 29, 1999, respondent was awarded $6,000 plus $778.64 in disbursements. Respondent did not send the sisters copies of these orders until months later and never reimbursed the sisters

for the attorneys' fees he was awarded. On August 18, 1999, he was replaced by new counsel.

Charges 26 and 27 alleged violations of DR 1-102 (a) (4) and (5) based on respondent's failure to inform the court that he had already collected a fee of $7,500. We agree with the Referee that these charges should be sustained. While respondent asserted that the judge to whom the fee application was submitted expressed his opinion that he did not want to know of attorneys' private fee arrangements in guardianship proceedings (the judge, who appeared as a character witness, did not so testify), respondent, in seeking a fee to be charged against an incompetent's funds, should have disclosed the information which was relevant to an accurate assessment of the fee.

Charge 28 alleged that in receiving both the $6,000 from the court and the $7,500 from the sisters, respondent violated DR 2-106 (a) (22 NYCRR 1200.11 [charging and collecting an excessive fee]). In sustaining this charge, the Referee noted that respondent valued his services at $9,625, but that his compensation totaled over $13,000. We sustain this charge and, in so doing, reject the Panel's explanation that respondent did not charge an "intrinsically excessive" fee since the sisters came to him with a problem on a Friday and he filed the petition the following Monday.

Finally, we sustain Charges 29 to 32, as did both the Referee and the Panel. Charges 29 and 30 alleged violations of DR 9-102 (c) (1) (failure to promptly notify a client of the receipt of funds in which the client has an interest) and (4) (failure to promptly pay client funds client is entitled to receive). Charges 31 and 32 alleged violations of DR 1-102 (a) (4) and (5) in that respondent misrepresented the fee arrangement in a January 10, 2000 letter to the Committee by stating that he told the sisters that their $7,500 payment was a "minimum retainer" and that he would accept the court's allowance for the balance which would be between $15,000 and $20,000. The Panel did not believe respondent's explanation, finding that his notification to the sisters of the court-awarded fee, albeit after a delay of approximately two months, was inconsistent with his version of the fee arrangement.

The Panel, noting that the Referee's recommendation of disbarment was influenced by his distaste for respondent's role in the heir-finding business, against which there is no legal prohibition, and the level of "vitriol" between respondent and Ms. Morse, found that respondent's conduct deserved the "severe

sanction'' of a one-year suspension. In our view, the Hearing Panel, which has the power to review the Referee's findings of fact and conclusions of law, which it may confirm, disaffirm or modify (22 NYCRR 605.14 [g] [1]), in many instances usurped the Referee's role involving credibility assessments and, in others, ignored them, while unfairly ascribing to him an unseemly motive for his recommended sanction.

Respondent urged a private reprimand or, at most, a public censure, since his acts were done innocently, albeit carelessly and arrogantly, and were not serious by themselves; nor were they intentional, premeditated or designed to harm another or aggrandize himself.

The Committee now moves to disaffirm the Panel's determination insofar as it recommended dismissal of certain charges and the imposition of a one-year suspension and to confirm the Referee's report and recommended sanction in its entirety.

By cross motion, respondent seeks dismissal of all charges and the imposition of a sanction no greater than public censure. While contending that the Committee has failed to establish by a preponderance of the evidence that he violated any disciplinary rules (although he admits his negligence violated the record-keeping rules), he urges that, if he did, the appropriate sanction should be a private reprimand or public censure. He also notes substantial mitigation and character evidence.

While the range of appropriate sanctions for the individual disciplinary violations that have been sustained might include public censure or a one-year suspension, we find that the totality of respondent's misconduct warrants a much more severe sanction.

Significantly, both the Referee and the Panel sustained the conversion charge, a charge which ''[w]e have consistently held[,] absent unusual mitigating circumstances, . . . constitutes serious professional misconduct [that] generally warrants disbarment'' (*Matter of Harley*, 298 AD2d 49, 51 [2002]; *see Matter of Harris*, 259 AD2d 170 [1999]). Although in *Matter of Albanese* (274 AD2d 284 [2000]), we imposed a four-year suspension rather than disbarment where an attorney intentionally converted to his own use a down payment, which he was holding in escrow, for the purchase of a cooperative apartment, we noted the attorney's previously unblemished record and, significantly, the isolated nature of the incident, clearly not a factor present here. Respondent in this case has engaged in a pattern of deliberately false and deceptive conduct, including

distortions of fact to clients, courts and the Committee, under-taken for purposes of self-aggrandizement and in an arrogant and devious manner. Moreover, in addition to the conversion, respondent has failed to preserve escrow funds, charged and col-lected an excessive fee, solicited clients and sought part of their share even though he was not retained by them (causing them to expend money to defend against his claim and delaying the distribution of the estate). In addition, these proceedings have been marked by his repeated misrepresentations, lack of candor and remorse and failure to acknowledge any misconduct in all three client matters involved herein. Respondent's otherwise unblemished record and character evidence, viewed in context, do not warrant leniency (*see Harley* at 51).

Accordingly, the Committee's motion should be granted to the extent of disaffirming the Panel's determination insofar as it recommended dismissal of certain charges and the imposition of a one-year suspension and sustaining Charges 1 to 3, 7 to 10, 13 to 15, 17 to 20 and 22 to 32, partially sustaining Charges 11 and 12 and disbarring respondent. The cross motion should be granted to the extent of dismissing Charges 4 to 6, 16 and 21 and partially dismissing Charges 11 and 12, and otherwise denied.

BUCKLEY, P.J., NARDELLI, ANDRIAS, SULLIVAN and FRIEDMAN, JJ., concur.

Respondent disbarred, and his name stricken from the roll of attorneys and counselors-at-law in the State of New York, effec-tive March 22, 2004.